ORDERED UNSEALED on 06/03/2026   s/ JudePeter

**SEALED**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

## ARREST ON OUT-OF-DISTRICT OFFENSE

CASE NUMBER:    26mj3291

(26-mj-8097-GCS)

The person charged as **Kenny BEDOYA** now appears before this United States District Court for an initial appearance as a result of the matter having been filed in the United States District Court for the Southern District of Illinois with a *Criminal Complaint* charging Defendant with:

*Code Section*                    *Offense Description*

**Count 1: 21 U.S.C. § 841(a)(1) and 841(b)(1)(C) - Conspiracy to Distribute a Controlled Substance: Cocaine**

**Count 2: 18 U.S.C. § 1952(a)(1), 1952(a)(3), and 1952(b) - Transportation in Aid of Racketeering Enterprise**

The Criminal Complaint and the Arrest Warrant for the Defendant which was issued by the United States District Court for the Southern District of Illinois are attached hereto.

I hereby swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:    June 3, 2026                                          _____ (signature)

_____Lucas Gravell_____ (print)
Deputy U.S. Marshal
United States Marshal's Service

Reviewed and Approved:

Dated:    June 3, 2026

_____ (signature)

Ricardo Cobran_____ (print)
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,               )
                                        )
        Plaintiff,                      )
                                        )
                vs.                     )       CASE NO. 26-mj-_8097_-GCS
                                        )
KENNY V. BEDOYA,                        )
                                        )
        Defendant.                      )

## WARRANT FOR ARREST

TO:     The United States Marshal and any Authorized United States Officer

        YOU ARE HEREBY COMMANDED to arrest **KENNY V. BEDOYA**, and bring

him or her forthwith to the nearest Magistrate Judge to answer a complaint charging him with:

> **COUNT 1: CONSPIRACY TO DISTRIBUTE A CONTROLLED SUSBTANCE: COCAINE**
>
> **COUNT 2: TRANSPORTATION IN AID OF RACKETEERING ENTERPRISE**

 in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(vi), and 846.

Gilbert C. Sison
Name of Issuing Officer

United States Magistrate Judge
Title of Issuing Officer

Gilbert C. Sison
Signature of Issuing Officer

5/11/2026        East St. Louis, IL
Date and Location:

(By) Deputy Clerk

Bail fixed at $_____    by    _____

                                          Name of Judicial Officer

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NUMBER: 26-mj-**3097**-GCS |
| | ) | |
| KENNY V. BEDOYA | ) | **FILED UNDER SEAL** |
| | ) | |
| Defendant. | ) | |

## CRIMINAL COMPLAINT

I, Kurt Schmulbach, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief:

### COUNT 1
### CONSPIRACY TO DISTRIBUTE A CONTROLLED SUBSTANCE

Beginning at an unknown time and continuing until on or about June 12, 2025, in Madison County, Illinois, within the Southern District of Illinois, the Western District of Pennsylvania and elsewhere,

### KENNY V. BEDOYA,

defendant herein, did conspire and agree with others, known and unknown to the United States Attorney, to knowingly and intentionally distribute and possess with the intent to distribute a controlled substance, to wit: cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C); all in violation of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 2(a).

1

## COUNT 2
### TRANSPORTATION IN AID OF RACKETEERING ENTERPRISE

Beginning at an unknown time and continuing until on or about June 12, 2025, in Madison County, Illinois, within the Southern District of Illinois, the Western District of Pennsylvania, and elsewhere,

### KENNY V. BEDOYA,

defendant herein, traveled in interstate commerce from the States of Pennsylvania to the State of Illinois, with the intent to distribute the proceeds of an unlawful activity, and with the intent to otherwise promote, manage, and carry on an unlawful activity, namely a business enterprise involving distribution of controlled substances, and thereafter performed and attempted to perform an act to distribute the proceeds of such unlawful activity and to otherwise promote, manage, and carry on the unlawful activity; all in violation of Title 18, United States Code, Section 1952(a)(1), 1952(a)(3), and 1952(b).

## FORFEITURE ALLEGATION

As a result of the foregoing offenses described in Counts 1 and 2,

### KENNY V. BEDOYA,

defendant herein, shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853, Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, any and all property constituting or derived from any proceeds said defendant obtained directly or indirectly, or property used to facilitate the violations alleged in Counts 1 and 2 of this Complaint. The property includes but is not limited to the following:

**$534,715.00 in United States Currency.**

2

## AFFIDAVIT

I, Kurt Schmulbach, am a Task Force Officer with the Drug Enforcement Administration (DEA) currently assigned to the Fairview Heights Resident Office (FHRO). I have been a Task Force Officer with the DEA since April of 2021. Since May 2005, I had been employed with the Smithton and Freeburg Police Departments. I am currently a police officer with the Lebanon Police Department in Illinois and have been since November 2012. While with the Lebanon Police Department, I have conducted patrol duties, criminal investigations, and served as a member of the Greater St. Louis Major Case Squad. During my tenure in law enforcement, I have participated in numerous drug investigations involving the manufacture, transportation, and distribution of controlled substances and illegal drug proceeds. These investigations have resulted in the seizure of controlled substances and proceeds from the sale of controlled substances, as well as arrests and convictions of drug traffickers. I am familiar with and have utilized normal methods of investigation, including but not limited to physical and electronic surveillance, questioning of witnesses, the use of search and arrest warrants, the use of informants, the use of pen registers, analysis of telephone records, the utilization of undercover officers, and the use of court-authorized wire intercepts.

The statements contained in this affidavit are based on my investigation, as well as information derived from reports and interviews of the law enforcement officers and witnesses named herein. This affidavit is meant to state facts sufficient to support a finding of probable cause that the named Defendant committed the charged offense and is not meant to contain a complete record of the entire investigation to date. In support of this Complaint, your affiant states as follows:

1.      On June 12, 2025, at approximately 2:53 p.m., Drug Enforcement Administration (DEA)

3

Task Force Officer (TFO) Douglas Danielson was monitoring traffic on Interstate 70 (I-70) at the 24-mile marker, within the Southern District of Illinois. TFO Danielson observed a white semi-truck tractor pulling a white 53-foot refrigerator trailer traveling on westbound I-70 approaching TFO Danielson's position. TFO Danielson observed the driver, later identified as Kenny Vego BEDOYA (hereinafter "BEDOYA"), appearing to avoid TFO Danielson's presence. TFO Danielson observed BEDOYA looking in the opposite direction. Through TFO Danielson's training and experience, TFO Danielson noted it to be unusual behavior as most semi-truck tractor drivers acknowledge the presence of patrol vehicles by looking in the direction of the patrol vehicles, waving, or looking forward keeping their eyes on the road.

2.    TFO Danielson pulled into the number one lane of I-70 westbound and approached the driver's side of the semi-tractor trailer to capture the United States Department of Transportation (USDOT) number which is a unique identifier assigned by the Federal Motor Carrier Safety Administration to motor carriers and other entities operating in interstate commerce. TFO Danielson conducted a computer inquiry which revealed the semi-truck tractor was a single truck and single driver company with an address of 472 N Henry Chavez Ct Unit 6b, San Luis, AZ 85349. TFO Danielson positioned himself behind the semi-truck tractor trailer and observed the semi-truck tractor cross the solid white line (Fog Line) multiple times, violating 625 ILCS 5/11-709 (Improper Lane Usage).

3.    TFO Danielson activated his emergency lights to affect a traffic stop for the above stated violations. After TFO Danielson activated his emergency lights, the semi-tractor trailer pulled over on the right-hand shoulder on I-70 WB near MM 18.

4

4.    TFO Danielson approached the vehicle from the passenger's side of the semi-tractor trailer. BEDOYA opened the passenger side door and indicated the passenger's side window did not work. TFO Danielson asked BEDOYA if it was okay for him to step up to the interior of the semi-tractor trailer. BEDOYA gave TFO Danielson permission to step up to the open interior of his semi-tractor trailer. TFO Danielson advised BEDOYA the reason for his stop, and BEDOYA acknowledged TFO Danielson's reasoning. TFO Danielson asked BEDOYA if he had his state issued driver's license. TFO Danielson asked BEDOYA if his trailer was loaded (e.g. carrying cargo), which BEDOYA advised the trailer was not loaded. Based on his training and experience, TFO Danielson found that pulling an unloaded trailer was uncommon for truck drivers because of the cost of driving empty trailers across long distances. It is common practice for drivers to obtain legitimate shipments and/or loads to increase the profitability of driving trucks across long distances. TFO Danielson asked BEDOYA where he was coming from. BEDOYA stated he came from Dayton, Ohio; additionally, indicating he was heading to Oklahoma to "rescue a truck." TFO Danielson asked BEDOYA if the semi-tractor trailer, he was driving was owned by him or owned by another person. BEDOYA stated he owned the semi-tractor trailer. TFO Danielson asked BEDOYA how long he owned the business. BEDOYA advised him he owned the business since March of 2019. Furthermore, BEDOYA stated he was looking down on his cellular phone and that was the reason why he crossed the solid white line. TFO Danielson asked BEDOYA for his book, which disclosed his semi-tractor trailer's current registration and insurance information.

5.    TFO Danielson advised BEDOYA he was going to take a picture of his front license plate

5

as well as take his California state issued driver's license back to his patrol vehicle so he could complete BEDOYA's warning for the above identified traffic violation. After returning to his vehicle, TFO Danielson conducted a standard license check, warrant status, and Law Enforcement Database System (LEADS) check. While conducting BEDOYA's information in LEADS, TFO Danielson observed BEDOYA had previous convictions for trafficking cocaine. An additional criminal history check was conducted. TFO Danielson noted that in 1991 BEDOYA was sentenced to prison for three years. According to BEDYOA's criminal history his sentence was for: Felon/Addict Possess Firearm, Carrying a Loaded Firearm, Transport/Sell Narcotic's. Furthermore, BEDOYA was sentenced to prison an additional five years for: Assault with Firearm on Person, Transport/Sell Narcotics. BEDOYA was released from prison in 1994 but was later convicted for Violation of Parole; thereafter, BEDOYA was sentenced to finish the remaining time he was originally sentenced and was released in 2003. Lastly, BEDOYA was sentenced to prison in 2009 for a term of 120 months with 60 months of supervised release. BEDOYA was sentenced for the following: Possession with Intent to Distribute Methamphetamine.

6. After reviewing BEDOYA's criminal history abstract and observing/learning the details regarding BEDOYA's travel, TFO Danielson requested an additional unit. While TFO Danielson was waiting for the additional unit, TFO Danielson exited his patrol vehicle and approached the passenger side of the semi-tractor trailer and climbed up next to the passenger compartment. TFO Danielson wanted to ensure he was pronouncing BEDOYA's last name correctly, so TFO Danielson asked BEDOYA how he pronounced his last name. BEDOYA advised him of the correct way to say his last name. TFO Danielson then

6

returned BEDOYA's driver's license, handing it directly to BEDOYA. TFO Danielson then informed BEDOYA that he worked for the DEA Task Force and asked BEDOYA if he had anything illegal in the interior of his semi-tractor truck or trailer. BEDOYA stated he had nothing illegal. TFO Danielson asked BEDOYA if he had any large amounts of United States Currency, anything over ten thousand dollars. BEDOYA answered "no." At this time, TFO Danielson asked BEDOYA if he had "any problem" with TFO Danielson searching his semi-tractor truck and trailer, which BEDOYA gave consent by stating "no," and that he did not have a problem allowing TFO Danielson to search. TFO Danielson advised BEDOYA he was waiting on his partner and asked BEDOYA if he could check the trailer first. BEDYOA proceeded to exit his semi-tractor trailer on the passenger side. BEDOYA followed TFO Danielson to the rear of his semi-tractor trailer and opened the rear door to the trailer. Once the rear door was open, TFO Danielson observed the trailer to be empty.

7.     Less than a minute later, as TFO Danielson and BEDOYA were at the rear of the trailer with BEDOYA, TFO Campbell arrived on scene to assist. Upon TFO Campbell's arrival, TFO Campbell began conversing with BEDOYA and noted immediately when he approached the rear of the semi-trailer that the trailer was empty, including later stating, it was not the industry standard.

8.     TFO Danielson advised TFO Campbell that BEDOYA gave consent to search his semi-tractor truck and trailer. TFO Danielson requested TFO Campbell to stay with BEDOYA at the rear of his trailer while he conducted a search of the interior of the semi-tractor truck. TFO Danielson started conducting a search within the interior of the semi-truck. TFO

7

Danielson entered the sleeping quarters of the semi-truck and checked the top bunk, which had a dark blue duffel bag with clothes and bathroom hygiene products inside. Additionally, TFO located a black duffel bag containing additional clothing. While continuing to search, TFO Danielson observed a blue vinyl bag with lettering indicating "The Queen City, ESTD 1832, Buffalo, New York." TFO Danielson observed a black trash bag within the blue vinyl bag. TFO Danielson retrieved the blue vinyl bag containing the sealed black trash bag. TFO Danielson observed that the contents within the blue vinyl bag were extremely heavy and appeared to be a solid like structure within the black bag. TFO Danielson used his two index fingers to put a small hole in the black trash bag so he could verify the contents within the black trash bag. TFO Danielson observed a zip lock bag containing multiple bundles of rubber banded United States Currency. Due to TFO Danielson's training and experience, the US Currency appeared to be packaged as drug proceeds.

9. After locating the currency, TFO Danielson got TFO Campbell's attention and advised him of his findings. TFO Campbell entered the semi-truck to confirm his findings and advised TFO Danielson to detain BEDOYA pending further investigation. TFO Danielson placed BEDOYA into one pair of handcuffs behind his back, checked for proper fit and double locked them. TFO Danielson conducted a pat down on BEDOYA's person which yielded negative results for weapons. TFO Campbell read BEDOYA his Miranda Right from his DEA-13A card. BEDOYA stated he understood his rights. TFO Campbell asked BEDOYA if he wished to speak with TFO Danielson and TFO Campbell. BEDOYA stated "no." TFO Danielson escorted BEDOYA to TFO Campbell's patrol car and secured BEDOYA in the

8

rear passenger side. TFO Danielson and TFO Campbell continued to search the interior of the semi-truck. TFO Danielson located a second blue vinyl bag on the top bunk with floral printing on it also including the name "Wegmans" written on the bottom. The blue vinyl bag had a black trash bag inside containing several zip lock bags with multiple bundles of rubber banded United Sates Currency. While continuing to search, TFO Danielson located a black backpack on the bottom bunk containing loose multiple bundles of rubber banded United States Currency.

10. Group Supervisor (GS) Jarret Neff, Special Agent (SA) Ussery, TFO Leo Kelly, TFO Kurt Schmulbach, TFO Kyle Taylor, TFO Nicholas Woloszyn, TFO Noe Marquez, and TFO Justin Krausz arrived to assist. BEDOYA was escorted to the front seat of SA Ussery's vehicle. SA Ussery again read BEDOYA his rights, per a DEA-13A card, to which BEDOYA advised he would like to speak with an attorney. No further questions were asked of BEDOYA reference the incident. SA Ussery asked BEDOYA if he would consent to agents searching his electronic devices, to which BEDOYA agreed, and provided all the devices he was in possession of and the unlock codes to access them. BEDOYA further signed a DEA-88 consent to search form regarding the devices.

11. TFO Danielson, as witnessed by TFO Krausz, secured the US currency into a Self-Sealing Evidence Enclosure (SSEE), which was signed and sealed on scene. TFO Danielson and TFO Krausz transported the US Currency to the DEA-FHRO.

12. SA Ussery and TFO Kelly transported BEDOYA to the DEA-FHRO for booking processing.

13. After processing BEDOYA, and as agents were beginning to release his property,

9

BEDOYA reinitiated conversation with agents, requesting to waive his rights that he had previously invoked and requested to speak with agents without an attorney present. BEDOYA was escorted back into the audio/video recorded interview room, where SA Ussery again clarified with him that he [BEDOYA] opted to voluntarily reinitiate conversations with agents without an attorney present, to which he agreed.

14. SA Ussery asked where BEDOYA had picked up the currency, to which he stated "Erie, Indiana." (It was later determined by agents that BEDOYA meant Erie, *Pennsylvania*.) BEDOYA described that he was originally travelling to Buffalo, New York to pick up a legitimate load. BEDOYA stated while en route to Buffalo, he was rerouted to an unknown location in Pennsylvania. BEDOYA stated he was going to attempt to pick up another legitimate load from Pennsylvania that would take him to Buffalo, where he was supposed to pick up the money. BEDOYA stated that when he was in Pennsylvania, "they" changed the pickup location to Cleveland, Ohio. BEDOYA advised once "they" provided him with the telephone number of a courier he was instructed to pick up the money from, the courier disclosed that he was currently located in Erie and asked if BEDOYA would meet in Erie for convenience.

15. SA Ussery asked BEDOYA who "they" were that was providing instructions to pick up money. BEDOYA advised his handler is in Mexico, who crosses the border into the United States from Mexico. BEDOYA advised he had met this individual six months ago. BEDOYA further clarified that he is a "relative of a relative." BEDOYA explained that this was the first time he had agreed to pick up money for these individuals. BEDOYA stated these individuals had asked him numerous times to transport

10

drugs, to which he declined, fearing the potential punishment for being caught especially considering his criminal history.

16. SA Ussery asked BEDOYA what his compensation was agreed to be for picking up the money, to which he stated the agreed amount was $15,000. BEDOYA explained that this is how he knew how much currency was in one of the bags containing $20,000. BEDOYA stated he had brought $5,000 and was instructed to remove $15,000 of the loose currency from the main money bag for his compensation. BEDOYA described that he was not aware of how much currency was in the bulk money bag but was aware the money from his backpack contained $20,000.

17. BEDOYA explained that he coordinated with the unknown male (UM) as to where to pick up the currency from at the phone number that was provided to him. BEDOYA described that the UM originally instructed him to have the transaction at a truck stop, but this made him (BEDOYA) nervous due to people being around and BEDOYA asked to pick another location. BEDOYA stated the UM then directed him to go to a Motel 6 located at 7455 Schultz Rd, Erie, PA 16509.

18. BEDOYA stated he arrived at the Motel 6 around 7:00 a.m. - 8:00a.m., where he met a black male, traveling alone in an older model tan or gray four door passenger vehicle. BEDOYA described the UM as a tall dark skin black male, approximately 35 years of age. BEDOYA could not recall a lot of detail regarding the male, as he was tired from the travel and the transaction was done quickly.

19. BEDOYA described how the transaction occurred in the rear portion of the hotel, where there was parking available that could accommodate a semi-truck. BEDOYA explained

11

that the male retrieved two bags from the trunk of the vehicle he was driving and provided them to him. BEDOYA described the bags the UM provided him were floral pattern cloth shopping bags. BEDOYA described that the currency was not vacuum sealed, it was just rubber banded inside the bags.

20. BEDOYA described the person providing him instructions for the money pickup to be his cousin's husband's nephew, only known to him as "Herman." BEDOYA provided "Herman's" phone number to agents. BEDOYA described that he had asked his sister's husband for a loan to perform work on his trailer to be repaired, and in turn was introduced to "Herman" to pick up bulk currency in order to make money. BEDOYA explained that he communicates with "Herman" on WhatsApp messenger.

21. SA Ussery asked if BEDOYA was nervous transporting the currency when he observed TFO Danielson's patrol vehicle. BEDOYA described that he recalled prior to getting pulled over he was texting codes to another driver and believed that's when he "went over the white lines," which caused the violation observed by TFO Danielson.

22. During the recorded interview, BEDOYA indicated his willingness to call "Herman" in the presence of agents to assist in the investigation. BEDOYA attempted to call "Herman" while agents were present, but "Herman" did not answer the call.

23. As agents were processing BEDOYA, and during a subsequent interview, BEDOYA informed agents that he had previously travelled to Mexicali to obtain kilo-quantity amounts of cocaine at "Herman's" direction and distribute the cocaine in California. According to BEDOYA, "Herman" had requested BEDOYA transport cocaine throughout the United States; however, BEDOYA refused to transport the cocaine long distances out

12

of a fear of law enforcement.

24.     Agents conducted a free-air canine sniff of the seized United States currency, placing the currency in a closed container, along with other closed containers that did not contain the currency. A certified canine alerted to the closed container that contained the currency indicating the presence of a narcotic odor. The currency was taken for an official count, which determined the total amount of currency was $534,715.

FURTHER AFFIANT SAYETH NAUGHT.

KURT SCHMULBACH (Affiliate)    Digitally signed by KURT SCHMULBACH (Affiliate)    Date: 2026.05.07 09:16:50 -05'00'

KURT SCHMULBACH
Task Force Officer
Drug Enforcement Administration

State of Illinois        )
                         )    SS.
County of St. Clair      )

Sworn to before me, and subscribed in my presence on the ___8th___ day of May 2026, at East St. Louis, Illinois.

GILBERT C. SISON
United States Magistrate Judge

UNITED STATES OF AMERICA

STEVEN D. WEINHOEFT
United States Attorney

Digitally signed by DANIEL CARRAWAY
Date: 2026.05.07 09:19:18 -05'00'

DANIEL S. CARRAWAY
Assistant United States Attorney

13